**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE SCHAEFER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Case No. 07 C 2438** |
| **vs.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| | ) | |
| **RICHARD WOLF MEDICAL** | ) | |
| **INSTRUMENTS, CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, George Schaefer ("Schaefer"), filed a single-count complaint against defendant,

Richard Wolf Medical Instruments, Corp. ("RWMI"), alleging age discrimination in violation of

the Age Discrimination in Employment Act of 1967 ("ADEA").[1]  RWMI moves for summary

judgment, arguing that Schaefer was terminated for a legitimate, non-discriminatory reason.  For

the following reasons, RWMI's motion for summary judgment [#31] is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c).  To determine whether any genuine fact exists, the court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and

---

[1] The court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1331 and the ADEA, codified at 29 U.S.C. § 621 *et seq.*

1

affidavits that are part of the record.  *Id*.  While the court must construe all facts in a light most

favorable to the non-moving party and draw all reasonable inferences in that party's favor,

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986),

where a claim or defense is factually unsupported, it should be disposed of on summary

judgment.  *Celotex Corp.* v. *Cartrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986).  The party seeking summary judgment bears the initial burden of proving there is no

genuine issue of material fact.  *Id*. at 323.  In response, the nonmoving party cannot rest on bare

pleadings alone but must use the evidentiary tools listed above to designate specific material

facts showing that there is a genuine issue for trial.  *Id*. at 324; *Insolia* v. *Philip Morris Inc.*,

216 F.3d 596, 598 (7th Cir. 2000).

## BACKGROUND

Schaefer was hired by RWMI[2] as a customer service representative in 1981.  Def.'s L.R.

56.1 SoF ¶ 6.  At that time, Schaefer was 43 years old.  *Id*.  Schaefer was soon promoted to the

position of buyer[3] in which he was solely responsible for establishing and running RWMI's

purchasing department, a multi-million dollar operation.  *Id*. ¶¶  8, 10.  Schaefer alone developed

the processes for placing purchase orders and authorizing payments.  *Id*. ¶ 12.  He was the only

employee at RWMI who knew what those processes were.  *Id*.

## I.      April 2003 Meeting

[2]RWMI manufactures endoscopes and medical instruments.  Def.'s L.R. 56.1 SoF ¶ 5.  It is a
subsidiary of Richard Wolf GmbH, a German company.  *Id*.

[3]Schaefer is fluent in German, a necessary prerequisite for the position of buyer.  *Id*. ¶ 9.

During the relevant time period, Schaefer's direct supervisor was Petra Johnson ("Johnson").[4] RWMI's Human Resources Manager was Marianne Stepp ("Stepp"). *Id.* ¶ 13. In April of 2003, Johnson and Stepp met with the eight RWMI employees who were at least 62 years old to determine if they had any retirement plans so that the company could make any necessary successorship plans. *Id.* Of those eight employees, three are still employed by RWMI, one is deceased, three are retired and one (Schaefer) was terminated. *Id.* When Johnson and Stepp met with Schaefer, he informed them that he had no plans to retire and told them that if he decided to do so, he would give them six months to one-year's notice. *Id.* ¶¶ 15-16. Schaefer admits that his age was not discussed outside of the context of his retirement plans. *See* Deposition of George Schaefer, attached as Ex. B to Def.'s L.R. 56.1 SoF ("Schaefer Dep.") at 181, lines 1-3. Thereafter, neither Johnson nor Stepp inquired about Schaefer's plans for retirement. Def.'s L.R. 56.1 SoF ¶ 20.

## II. Schaefer's Job Performance Prior to July 2005

In June 2004, Johnson issued a written evaluation of Schaefer's performance. Johnson rated Schaefer's performance of his purchasing function as a seven on a scale of one to ten and his management of the purchasing clerk as an eight. *See* Ex. 9 to Schaefer Dep. In regard to Schaefer's strengths, Johnson stated that Schaefer was "very organized, loyal and dependable," has "a firm grip on purchasing activities and negotiates always in the best interest of the company." *Id.* Under weaknesses, Johnson wrote that she had verbally addressed performance issues in April regarding poor judgment on a fax machine repair issue, lack of initiative

---

[4] Johnson was hired as RWMI's Director of Administration in 1999. *See* ¶ 1 of Ex. D to Def.'s L.R. 56.1 SoF. As Director of Administration, Johnson was Schaefer's direct supervisor from 1999 until he was terminated by her in July 2006. Def.'s L.R. 56.1 SoF ¶ 22.

regarding research on a new copier, and lack of communication with her regarding certain vendor charges. *Id*. Under goals, Johnson wrote that Schaefer should "seek better communication with co-workers and supervisor, and take initiative as to how we can streamline operations and work smarter." *Id.* In his July 2005 review, Schaefer received the same ratings for performance and managing others, as well as similar remarks regarding his strengths. *See* Ex.11 to Schaefer Dep. Under weaknesses, Johnson wrote that she had addressed several behavioral issues with Schaefer throughout 2005 and stated that Schaefer's "behavior continues to be brash, impolite, and at times downright rude" and that his attitude toward the company is "very negative." *Id*. Under goals, Johnson wrote that Schaefer should "seek better communication with supervisor, co-workers and vendors." *Id*. Johnson concluded that "a merit increase is not justified." *Id*.

As noted on his 2004 and 2005 performance evaluations, several coworkers and vendors complained of Schaefer's behavior during that time period. In February 2005, Rick Greiber, RWMI's Group Marketing Manager, sent an email to Johnson and Stepp after he witnessed Schaefer inappropriately admonish one of his employees. *See* Def.'s L.R. 56.1 SoF ¶ 45; Ex. 6 to Deposition of Marianne Stepp, attached as Ex. C to Def.'s L.R. 56.1 SoF 9 ("Stepp Dep."). Also in that month, Johnson sent an email to Schaefer regarding complaints received from in-house and outside vendors about what they characterized as his "brash, unfriendly, abusive, arrogant and demeaning" attitude. *Id*. ¶ 46; Ex. 10 to Schaefer Dep. Johnson urged Schaefer to change his behavior and reiterated that vendors "must be treated with professional courtesy." *Id*. Stepp also testified that she had received a number of complaints and had herself experienced Schaefer's offensive and disrespectful behavior. Def.'s L.R. 56.1 SoF ¶ 54.

## III.    Schaefer's Job Performance After July 2005

Schaefer admits that after receiving his July 2005 performance evaluation, several incidents occurred where he failed to follow instructions, cooperate and communicate with others.  The majority of these incidents involve Johnson and Sabine Bieschke ("Bieschke"), who was hired in September 2005 to be the purchasing department's assistant buyer.

### A.    Schaefer's Interactions with his Direct Supervisor

Until 2004, Schaefer ran the purchasing department with only minimal supervision from his superiors.  *Id*. ¶ 23.  Johnson became more actively involved in the purchasing department around 2004 to ensure compliance with new FDA regulation and to increase the department's efficiency.[5]  *Id*.  Schaefer admits that Johnson "tried" to give him directions on how to do his job but that he did not believe she had the knowledge to do so.  *Id*. ¶ 25.  Schaefer testified that he "knew how to do [his] job and how to do it best."  *Id*. ¶ 24.

In August 2005, Johnson instructed Schaefer to update her regularly on a certain purchasing contract but Schaefer failed to do so.  *Id*. ¶ 29.  In October 2005, Schaefer placed an order for a tool without obtaining the required budget to do so despite Johnson's instruction to the contrary.  *Id*. ¶ 30.  In late 2005, Schaefer disregarded Johnson's efforts to improve the efficiency of the purchasing department on several occasions by refusing to timely heed

---

[5]RWMI also contends that Johnson became more involved in order to increase the efficiency of the purchasing department in order to keep up with an increasing workload and more purchases from American, rather than German vendors.  Schaefer denies this.  *See* Def.'s L.R. 56.1 SoF ¶ 23 and Pl.'s Resp. thereto.  The materials submitted show that Johnson did try to implement changes in order to increase the efficiency of the purchasing department.  Johnson encouraged Schaefer to streamline the process for placing orders and use his "Out of Office Assistant" while on vacation to prevent oversights in his absence.  *See*, *e.g*., Emails from Johnson to Schaefer, attached as Tabs 4-7 to Johnson Decl.  Accordingly, the court accepts that one of Johnson's goals in becoming involved in the purchasing department was to increase its efficiency.

Johnson's directions to (1) stop issuing confirmation orders after goods were already in-house, *id*. ¶ 31; (2) place purchase orders through the new computer system, *id*. ¶ 31; and (3) use his out-of-office assistant while on vacation, *id*. ¶¶ 33-35. Johnson gave Schaefer a verbal warning in late December 2005, after his failure to use his out-of-office assistant while on vacation resulted in a late payment to a vendor who consequently withheld a $110,000 shipment of new goods. *Id*. ¶ 35. In addition to ignoring Johnson's directions to train Bieschke from late 2005 to early 2006 (described below), in May 2006, only a few months before his termination, Schaefer failed to inform Johnson that RWMI had received a credit increase with Sony even though he knew that Johnson was seeking an increase with that vendor. *Id*. ¶ 40.

### B. Schaefer's Interactions with the Assistant Buyer

When Schaefer's long-time assistant retired in 2005,[6] Johnson determined that RWMI needed an assistant "who would be qualified to be mentored by Schaefer and learn all aspects of the purchasing function" and to be Schaefer's successor if and when he chose to retire. *Id*. ¶¶ 53-54. On September 1, 2005, the company hired Bieschke to be the purchasing department's assistant buyer. *Id*. ¶ 54. Although it was understood that Bieschke would be Schaefer's "ultimate successor," no time frame was established for Bieschke to replace Schaefer.[7] *Id*. ¶¶

---

[6] Schaefer's assistant from 1994 to 2005 performed only clerical duties. Def.'s L.R. 56.1 SoF ¶¶ 51-52.

[7] Schaefer contends that "some sort of time frame" had been established because Johnson and Marianne Stepp, RWMI's Human Resources Manager, repeatedly told Bieschke to "be patient." *See* Pl.'s Resp. to L.R. 56.1 SoF ¶ 56 (citing Stepp Dep. at 49 and Ex. 3 to the Deposition of Petra Johnson, attached as Ex. A to Def.'s L.R. 56.1 SoF ("Johnson Dep.")). There is no exhibit 3 attached to Johnson's Deposition and the referenced portion of Stepp's testimony, undermines Schaefer's contention. On page 49, Stepp testified regarding a series of notes made during meetings in February 2006 between Stepp, Johnson, Schaefer and Bieschke regarding Schaefer's refusal to train Bieschke after she was hired:

(continued...)

56-57. Johnson directed Schaefer to train Bieschke on all aspects of the purchasing function. *Id.* ¶ 55. Schaefer did not accept the expanded role Johnson sought for the assistant buyer and believed that the duties and responsibilities of the assistant buyer should be clerical. *Id.* ¶ 57. After Bieschke was hired, the only tasks Schaefer could recall assigning her were buying office supplies and furniture. *Id.* ¶ 58.

Bieschke informed Johnson that Schaefer was not training her and was, in fact, hostile and disrespectful toward her. *Id.* ¶ 59. On November 2, 2005, Johnson sent Schaefer an email requesting that he train Bieschke on various vender contracts and include her in all vendor meetings. *Id.* ¶ 60. Schaefer testified that, despite Johnson's directions, he could not recall talking to Bieschke about the vendor contracts and admitted that he did not include Bieschke in all vendor meetings. *Id.* On December 7, 2005, Stepp and Johnson formally met with Schaefer to address his failure to train Bieschke and his inappropriate behavior towards another coworker, Deanna White. *Id.* ¶ 61.

On January 3, 2006, Bieschke sent Schaefer the following email:

---

[7](...continued)
Q: All right. So if we go down here - - On the last page where it says "Be patient. Sabina [*sic*] - I can handle this, but I will not be treated this way."
A: Correct
Q: What's that note in reference to?
A: This was a meeting we had with Sabina [*sic*]. Ms. Johnson is telling Sabina [*sic*] that she needs to be patient, to – you know, that George is a wealth of knowledge and that he needs to – she needs to learn from him and allow him to mentor her, and Sabina [*sic*] is saying that she will not be treated – continue to be treated this disrespectfully by George.

Stepp. Dep. at 49-50, lines 14-24, 1-3. This testimony indicates that Bieschke was asked to "be patient" in order to learn from George, not to be patient until she was to replace him. Thus, the court does not accept Schaefer's assertion that a time frame existed in which Bieschke was to replace him.

> George:
>
> I am running into problems with the work load.  There are many invoices that
> need processing on top of the POs to type.  Do you have any suggestions on how
> to prioritize the workload?
>
> With best regards,
> Sabine Bieschke

*Id.* ¶ 64; Ex. 2 to Schaefer Dep.  The next day, Schaefer sent Bieschke the following email in

response:

> The best suggestion I have for you is to look for another job, because I need
> somebody here who can handle the workload.

Ex. 2 to Schaefer Dep.  Based on this email exchange, Johnson issued a formal written warning

to Schaefer on January 5, 2006 stating:

> George's [assistant] addressed him about a work problem.  He did not address the
> issue, provide a solution or coach her about the problem.  The email sent to the
> [assistant] was inappropriate [and] unprofessional for a manager/supervisor and
> only increased the problem.

*Id.*  Less than two months later, on March 24, 2006, Bieschke resigned from her position at

RWMI.  Def.'s L.R. 56.1 SoF ¶ 66.  After Bieschke left, the German office of RWMI informed

Johnson that several purchase orders had incorrect account numbers.  Def.'s L.R. 56.1 SoF ¶ 41;

Declaration of Petra Johnson, attached as Ex. C to Def.'s L.R. 56.1 SoF ("Johnson Decl."), ¶ 31

and Ex. 18 thereto.  Johnson informed Schaefer of this on June 7, 2006.  *Id.*

## IV.     April 2006 Meeting

In April 2006, Schaefer met with Johnson, Niels Schmidt, RWMI's General Manager,

and Alfons Notheis, the CEO of Richard Wolf GmbH, its German parent company.  *Id.* ¶ 67.

Notheis explained to Schaefer that the purpose of the meeting was to inform him that RWMI was

going to hire an additional person to work in the purchasing department who would be his

equal.[8]  *Id.* ¶ 68.  At some point during this meeting, Notheis very briefly "raised the question" of Schaefer's age.  *Id.* ¶ 74.  Johnson immediately cut in and stated that the meeting had nothing to do with Schaefer's age.  *Id.*

## V.    Schaefer's Termination on July 5, 2006

Schaefer was terminated on July 5, 2006 after returning from a vacation which he admits was not approved by RWMI.  *See* Def.'s L.R. 56.1 SoF ¶ 90 and Pl.'s Resp. thereto; Schaefer Dep. at 169, lines 8-22.  Schaefer admits that RWMI has a vacation policy which requires prior approval by the employee's supervisor.  *Id.* ¶¶ 75, 78.  On April 7, 2006, Schaefer informed Johnson via email that he wished to take four consecutive weeks of vacation, from June 19th to July 21st.  Ex. 21 to Johnson Decl.  The next day Johnson responded:

> George:
>
> Thanks for being proactive.  I thought too that your April 17 vacation does not come at a good time.  At the present time, your vacation schedule will very much depend on when we get a second person hired on.
>
> Your current vacation plans as mentioned below (June 19th through July 14th) would mean 4 consecutive weeks off.  It is unusual for RWMI to grant that much time off at once.
>
> I assume that you need to take 10 days from 2005 before 06/30 when they expire. Is that correct? Could you schedule those 10 days earlier, say a week in May and a week in June?  Please advise.
>
> Best regards,
> Petra Johnson

*Id.*  Schaefer never responded to this email and he and Johnson had no further conversations

---

[8]RWMI contends that the purpose of the meeting was to discuss Schaefer's repeated acts of insubordination toward her, and to reaffirm her authority as his supervisor.  Def.'s L.R. 56.1 SoF ¶ 69. Because the court must construe the facts in the light most favorable to the non-movant, it accepts Schaefer's explanation of the reason for the meeting.

regarding his vacation plans.  *Id.* ¶ 89; Schaefer Dep. at 169-70, lines 20-24, 1-4.

On June 19, 2006, Schaefer left on vacation without informing Johnson or the purchasing department in Germany and without setting up his out-of-office assistant.  *Id.* ¶ 93.  He returned on July 5, 2006.  *Id.* ¶ 101.  While he was away, Schaefer left the purchasing department in the hands of Kelly Thompson, a temporary worker who had been brought in to do clerical work less than four months earlier and who did not speak German.  *Id.* ¶¶ 85, 95.  Johnson learned that Schaefer was gone when she tried to contact him on his first day of vacation.  *Id.* ¶ 93.  In light of what Johnson considered to be Schaefer's decision to take unauthorized vacation and other insubordinate behavior, Johnson decided to terminate Schaefer when he returned to the office on July 5, 2006.  *Id.* ¶¶ 97, 101.  Alfons Notheis was not involved in Johnson's decision to terminate Schaefer.[9]  *Id.* ¶ 100.  The only other RWMI employee to take unauthorized vacation was Jennifer Kruse, who was terminated in February 2000 at the age of 24.  *Id.* ¶ 104.  After Schaefer was fired, Christian Zimmer, age 29, was hired to be RWMI's Buyer.  *Id.* ¶ 106.  Kelly Thompson was hired to be the assistant buyer.  *Id.*

---

[9] Schaefer contends that Johnson sent Notheis a memorandum dictating Schaefer's termination and that such an action implies that Notheis had a role in the termination.  *See* Pl.'s Resp. to Def.'s L.R. 56.1 SoF ¶ 100.  Schaefer cites Exhibit 12 to Johnson's Deposition as supporting evidence.  Although Exhibit 12 is not included with Johnson's Deposition transcript, the same document appears to be attached as Ex. 23 to Johnson's Declaration; however, it does not indicate that it was sent to Notheis.  Moreover, Schaefer admits that Johnson did not advise anyone other than Frau Knodel in Germany of her decision to terminate Schaefer.  Def.'s L.R. 56.1 SoF ¶ 99.  Accordingly, the court will not infer that Notheis, who works in Germany, was involved in the decision to terminate Schaefer.

**DISCUSSION**

A plaintiff may establish age discrimination under the ADEA through direct or indirect proof. *Huff* v. *UARCO, Inc.*, 122 F.3d 374, 379 (7th Cir. 1997). "[D]irect proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.*, "You're too old to work here."), but also includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences. *Luks* v. *Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006) (internal quotations omitted) (citing *Sylvester* v. *SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006)). "The indirect method of proof involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 702, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 688 (1973)." *Id.* Schaefer argues that he can establish age discrimination through both methods.

**I.     Direct Method of Proof**

Under the direct method of proof, circumstantial evidence "need not necessarily take the form of a convincingly rich mosaic; it is enough that the circumstances give rise to a reasonable and straightforward inference that the employer has relied on a proscribed factor in taking action against the employee." *Luks*, 467 F.3d at 1053. While "isolated comments that are no more than 'stray' remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus," *Merillat* v. *Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006), a remark can provide an inference of discrimination when it was (1) made by the decision maker or one having input on the employment decision in question, (2) made around the time of the decision and (3) in reference to the adverse employment action complained of. *Id.*

Schaefer relies on circumstantial evidence to prove his age discrimination claim, identifying three remarks which he argues constitute a "convincing mosaic of discrimination." *See* Pl.'s Resp. at 11. The first remark occurred at the April 2003 meeting in which he was asked about his retirement plans. *Id*. at 10. The second remark occurred in late 2005 when Johnson instructed Schaefer to train Bieschke to be the Assistant Buyer with the understanding that she would be his ultimate replacement. *Id*. The third remark occurred when Notheis asked Schaefer how old he was at the April 2006 meeting. *Id*.

A.    **April 2003 Meeting**

RWMI argues that the April 2003 meeting at which Johnson and Stepp asked Schaefer about his plans for retirement does not constitute direct proof of age discrimination because under Seventh Circuit precedent, an isolated inquiry about an employee's retirement plans is not evidence of wrongful age discrimination. The Seventh Circuit has stated that "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi* v. *Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (Posner, J.) (two inquiries by the plaintiff's boss about when plaintiff was planning on retiring did not constitute direct evidence of discrimination). The Seventh Circuit has consistently refused to consider a single inquiry from an employer regarding its employee's retirement plans to be direct evidence of age discrimination. *See id.*; *Pitasi* v. *Gartner Group, Inc.*, 184 F.3d 709, 714-15 (7th Cir. 1999) (employer's offer to give employee early retirement and extra compensation due to his age does not alone give rise to an inference of discrimination) (citing *Halloway* v. *Milwaukee County*, 180 F.3d 820, 825-26 (7th Cir. 1999)). *See also Greenberg* v. *Union Camp Corp.*, 48 F.3d 22, 29 (1st Cir. 1995) (citing *Colosi* for the

proposition that a single inquiry by an employer as to an employee's plans for retirement does not necessarily show animosity towards age).

Schaefer admits that the only instance in which RWMI asked him about his retirement plans was at the April 2003 meeting. Schaefer also admits that his age was not specifically discussed. Indeed, RWMI's statement of material facts states that he "is not really basing his claim on this April 2003 meeting." *See* Def.'s Resp. to L.R. 56.1 SoF ¶ 109. Thus, according to Seventh Circuit case law, Johnson's and Stepp's inquiry regarding Schaefer's retirement plans do not indicate that RWMI based its decision to terminate Schaefer on age related bias.[10]

### B. RWMI's Decision to Hire Bieschke and its Direction that Schaefer Train Her

Schaefer argues that the decision to hire Bieschke as his ultimate replacement in September 2005 constitutes direct proof of age discrimination because he had already informed RWMI that he had no plans to retire in April 2003. Pl.'s Resp. at 11. RWMI contends that hiring Bieschke as an assistant buyer and directing Schaefer to train her was a legitimate business decision and not motivated by a desire to discriminate against Schaefer based on his age. Def.'s Reply at 6. RWMI did not hire Bieschke or instruct Schaefer to train anyone to be his ultimate replacement until more than two and a half years after Schaefer stated that he had no plans to retire. Furthermore, after Bieschke was hired, no duties or responsibilities were taken away from Schaefer and no time frame was given for her to succeed him. Even when viewed in context with the other remarks Schaefer argues constitute direct proof of discrimination,

---

[10] In further support of this conclusion, RWMI also argues that the April 2003 meeting is not indicative of age discrimination because of the seven other employees who were asked about their retirement plans at the same as Schaefer, none was terminated. Three of those employees still work at RWMI, three retired and one is deceased. Therefore, it does not appear that RWMI terminated or forced out any other similarly situated employees.

Johnson's decision to hire Bieschke and her instruction that Schaefer train her do not permit an inference of discrimination. RWMI's inquiry into his retirement plans, and Schaefer's response that he had none, occurred two years before Schaefer was instructed to train Bieschke as his ultimate replacement. Schaefer's termination in July 2006 did not occur until more than ten months later and followed his taking of an unauthorized vacation as well as a series of incidents in which Schaefer was admonished, counseled or disciplined about his conduct. The 10-month gap of time coupled with these intervening events means that Schaefer's termination was not "contemporaneous with the discharge or causally related to the discharge decision making process." *See Robin* v. *ESPO Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (internal citations and quotations omitted) (age-related comments made two years before termination do not indicate that adverse employment decision was based on discriminatory animus). Lastly, RWMI's position that it hired Bieschke because it wanted to change the way the purchasing department was staffed and increase its efficiency, not because it wanted to force Schaefer out due to his age, is substantiated by the fact that after Schaefer was terminated and a younger person was made the buyer, RWMI still chose to staff the purchasing department with an assistant buyer. Thus, the undisputed facts surrounding RWMI's decision to hire Bieschke and have Schaefer train her do not permit a reasonable and straightforward inference that Schaefer was terminated because of his age.

### C. April 2006 Meeting

Schaefer argues that Notheis's question about Schaefer's age at the April 2006 meeting constitutes circumstantial evidence of age discrimination because it occurred within the three months prior to his termination. As RWMI argues, it cannot be inferred from Notheis's question

that Schaefer was terminated due to his age because the age-related remark at issue was not made by Johnson, the person who decided to terminate Schaefer. *See Luks*, 467 F.3d at 1055 (employee's reference to plaintiff as the "old guy in the department" was not indicative of age discrimination where that employee did not make the decision to fire plaintiff). Schaefer has offered no evidence showing that Notheis, the CEO of RWMI's German parent company, was involved in Johnson's decision to terminate him. To the contrary, Schaefer has admitted that Johnson spoke to no one at the German parent company other than Frau Knodel regarding her decision to terminate Schaefer. Furthermore, given the fact that Johnson made it clear that the April 2006 meeting had nothing to do with how old Schaefer was and that she prevented further discussion of the issue, this incident does not support a finding that Johnson's decision to terminate Schaefer was motivated by his age. Thus, the April 2006 meeting does not permit an inference that Schaefer was terminated because of his age.

Taken together, the three remarks on which Schaefer relies do not support an inference that Johnson's decision to terminate Schaefer was motivated by age-related bias. Accordingly, Schaefer has failed to show that a genuine issue of material fact exists as to his discrimination claim under the direct method of proof.

## II.     Indirect Method of Proof

Under the indirect method of proof, the plaintiff bears the initial burden of producing evidence to sustain a *prima facie* case. If the plaintiff meets this burden, the employer must then produce a legitimate, non-discriminatory reason for its action. If the employer offers a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to present evidence that the

employer's proffered reason is pretextual.  *Johnson* v. *Zema Systems Corp.*, 170 F.3d 734, 742 (7th Cir. 1999).

**A.**     ***Prima Facie* Case**

To establish a *prima facie* case of age discrimination, Schaefer must present evidence to show that there is a triable issue of fact on each of the following elements: (1) he was over forty; (2) he was performing at a satisfactory level; (3) he was subject to an adverse employment action; and (4) he was treated less favorably than younger, similarly situated employees. *Schuster* v. *Lucent Techs., Inc.*, 327 F.3d 569, 574 (7th Cir. 2003).  RWMI disputes only the second element: whether Schaefer was performing at a satisfactory level.  In order to determine whether an employee was performing at a satisfactory level, the Seventh Circuit requires district courts to ask whether the plaintiff was meeting his employer's legitimate expectations at the time he was terminated.  *See Luckie* v. *Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004); *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 545-46 (7th Cir. 2002) (citing *Karazanos* v. *Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)).

**1.     Schaefer's June 2004 and July 2005  Performance Reviews**

The main evidence offered by Schaefer to show that he was performing at a satisfactory level are his last two performance reviews, which he characterizes as above average.  Pl.'s Reply at 12.  RWMI contends that Schaefer's 2004 and 2005 performance reviews are not sufficient to establish an issue of material fact as to whether Schaefer was meeting RWMI's legitimate expectations because the reviews are mixed and do not accurately reflect how Schaefer was performing at the time of his termination in July 2006.  While Johnson scored Schaefer above average in regard to his performance of the purchasing function and management of the

purchasing clerk on both the June 2004 and July 2005 reviews, she noted several other problems with his performance. In the June 2004 review, Johnson stated that she had verbally addressed issues with Schaefer's performance regarding poor judgment, lack of initiative, and lack of communication. The July 2005 review indicates that Schaefer's performance was declining. It describes Schaefer's behavior as brash, impolite and rude and his attitude toward RWMI as very negative. It indicates that Johnson had tried to discuss such issues with Schaefer but that they had not been resolved. Consistent with her remarks, Johnson did not award Schaefer a merit increase. Were these mixed performance reviews the only evidence of Schaefer's performance prior to his termination in July 2006, Schaefer might have been able to establish a genuine issue of material fact as to whether he was performing up to RWMI's legitimate expectations. As RWMI argues, however, the undisputed facts show that Schaefer was not performing up to its legitimate expectations in the year prior to his termination.[11]

### 2. Schaefer's Performance from July 2005 to July 2006

RWMI argues that there is no genuine issue of material fact as to whether Schaefer was performing up to its legitimate expectations because Schaefer admits to several facts from mid-2005 to mid-2006 which show that Schaefer was insubordinate, uncommunicative, and that he refused to modify his behavior despite repeated requests by his superior. After July 2005, Schaefer admits that he consistently failed to communicate with Johnson and resisted or outright refused to follow her directions to change or implement new processes in the purchasing

---

[11] Schaefer relies on *Merillat*, 470 F.3d at 691-92, for the proposition that where a plaintiff's performance reviews contain both positive and negative remarks, a genuine issue of material fact exists sufficient to prevent summary judgment on plaintiff's *prima facie* case. *Merillat* is distinguishable from this case, however, because here there is substantial undisputed evidence beyond Schaefer's mixed performance reviews to support RWMI's contention that he was not performing up to its legitimate expectations.

department.  Schaefer also admits that he flatly refused to follow Johnson's directions to train Bieschke to be the assistant buyer and was hostile toward her.[12]  This is best reflected in his January 5, 2006 response to Bieschke's request for guidance on prioritizing her workload in which he stated that his best advice was to "look for another job, because I need somebody here who can handle the workload."  *See supra* at 8.  In lieu of this email exchange, Johnson issued a formal written warning to Schaefer, which he did not heed.  Ultimately, Bieschke resigned in March 2006 because of Schaefer's abusive treatment of her.[13]  The undisputed facts also show that Schaefer continued to have performance problems after Bieschke resigned and up to the time he was terminated in July 2006.  These problems appear to be in large part due to the purchasing department being understaffed in Bieschke's absence.  For example, in June 2006, Schaefer admits that mistakes on several purchase orders were made.

Schaefer's interactions with Johnson and Bieschke belie his contention that he was performing his job satisfactorily and, instead, show that Schaefer failed to fulfill RWMI's legitimate expectations that he would (1) communicate with his superior and follow her directions in order to improve the efficiency and continuity of the purchasing department; and (2) train someone to be an assistant buyer in order to staff the purchasing department in such a

---

[12] In addition to his problems with Bieschke, Schaefer was also having problems with other coworkers, such as Deanna White.

[13] In response to RWMI's argument that Schaefer's treatment of Bieschke is evidence of his failure to perform to its legitimate expectations, Schaefer states that "Bieschke was supposed to be [] Schaefer's replacement and from the beginning her behavior was biased with her goals and career path being in direct conflict with [his] future intentions."  Pl.'s Resp. at 13.  While Schaefer may have felt that he and Bieschke were in direct conflict, the court fails to see how this justifies Schaefer's behavior. Bieschke was only to succeed Schaefer when he retired and appears to have made repeated efforts to get along with Schaefer.  Moreover, RWMI had a legitimate interest in providing for the future by staffing the purchasing department to increase its efficiency and sustainability.  Thus, the court will not disregard Schaefer's refusal to train Bieschke with respect to determining whether he was fulfilling RWMI's legitimate expectations.

way that would allow it to continue operating in the event of Schaefer's absence, whether that absence should be temporary (e.g., while he was on vacation) or permanent (e.g., after his eventual retirement).

### 3. Schaefer's Vacation from June 19 to July 5, 2006

Any doubt as to whether Schaefer was not performing up to RWMI's legitimate expectations in the year before his termination is foreclosed by his decision to take vacation without securing his supervisor's prior approval. Schaefer admits that he left for vacation on June 19, 2006 without receiving formal approval from Johnson before he left. Schaefer's argument that his vacation was not unauthorized, *see* Resp. at 14-15, is unconvincing. In response to Schaefer's vacation request, Johnson noted that it was unusual for RWMI to grant an employee four consecutive weeks of vacation, stated that Schaefer's vacation schedule would depend on when a second person was hired, suggested a different time frame for his vacation, and requested that Schaefer respond. At that point, Schaefer was obligated not only to alter his vacation schedule but to respond to Johnson's email and secure formal approval of his final vacation plans, something that Schaefer admits he failed to do. Schaefer argues that his vacation was not unauthorized because he cut two weeks off of his vacation in response to Johnson's email; however, it is clear from Johnson's April 8th email that her approval of Schaefer's vacation was dependent not only upon the length of his requested vacation but whether there was an employee whom she felt was competent to run the purchasing department while Schaefer was on vacation. Schaefer went on vacation without formal approval; and he left the purchasing department, which he admits is a multi-million dollar business, to be run by a temporary worker who was not an employee of RWMI, who had only performed clerical tasks and who had worked

at RWMI for less than four months.[14]  While Schaefer may have felt comfortable with his decision to leave the purchasing department for two weeks under these circumstances, that decision was not his to make.   RWMI had a legitimate expectation that Schaefer, like all other of its employees, would follow company policy and have his vacation plans formally approved by his supervisor.  When Schaefer left for vacation without prior approval, he failed to meet RWMI's legitimate expectations.

Because Schaefer has not presented sufficient evidence to show that he was meeting RWMI's legitimate expectations, Schaefer fails to establish a *prima facie* case of age discrimination and RWMI's motion for summary judgement will be granted.

Even if Schaefer had established a *prima facie* case of age discrimination, RWMI would still prevail.  RWMI has articulated a legitimate non-discriminatory reason for firing Schaefer: his taking of an unauthorized vacation, in addition to his insubordination, failure to communicate and repeated refusals to modify his behavior in the year before his termination.  Furthermore, Schaefer has failed to fulfill his burden of coming forward with "specific facts sufficient to cast doubt" on RWMI's proffered non-discriminatory reasons for his dismissal.  *See Schuster*, 327 F.3d at 578-79.  Schaefer has done no more than argue that RWMI's decision to terminate him for taking unauthorized vacation was pretextual because his vacation was not in fact unauthorized.  As discussed above, however, this position is untenable given Johnson's response to his vacation request and his own admission that she did not formally approve his vacation before he left in June.  It is also significant that the only other RWMI employee to take

---

[14]Schaefer also left without turning on his out-of-office assistant, which he had previously been instructed to do.

unauthorized vacation was also terminated because this tends to show that RWMI's proffered reason for Schaefer's termination is not pretextual. Thus, Schaefer has failed to establish an issue of fact as to whether RWMI's proffered reason is a pretext for age discrimination.

## CONCLUSION AND ORDER

For the foregoing reasons, the defendant's motion for summary judgment [#31] is granted. The clerk is instructed to enter summary judgment in favor of the defendant. This case is terminated.

Dated: March 31, 2009      Enter: _____

JOAN HUMPHREY LEFKOW
United States District Judge